OPINION
{¶ 1} Defendant-appellant James P. Collins appeals his convictions and sentences on two counts of domestic violence entered by the Tuscarawas County Court of Common Pleas, following a jury trial. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On October 3, 2001, the Tuscarawas County Grand Jury indicted appellant on two counts of domestic violence, in violation of R.C. 2919.25(A), both felonies of the fifth degree. At his arraignment on October 5, 2001, appellant entered pleas of not guilty to the charges. Appellant was represented by an attorney from the Joint County Public Defender's Office for the purposes of arraignment only as the Public Defender's Office had a conflict of interest. Thereafter, the trial court appointed Attorney Ronald L. Collins to represent appellant.
 {¶ 3} The matter came on for trial before a jury on May 14, 2002. The following evidence was adduced at trial. Officer Shawn Nelson of the New Philadelphia Police Department testified he was dispatched to 939 Logan Street in New Philadelphia, Ohio, on August 12, 2001, in response to a 911 call placed by a boy named Jimmy Warner. When Officer Nelson arrived at the address, he found Helen Jean Warner, the boy's mother, with a swollen black eye, a swelling knot on her head, and bruises on her arm. Warner, whose clothing was wet, told the officer appellant had thrown her into the shower and turned on the hot water. Warner further advised the officer appellant lived at the Logan Street address with her and her children.
 {¶ 4} Appellant, who had fled the scene, was subsequently arrested. While talking with police, appellant acknowledged he was at the Logan Street residence, was intoxicated, and was involved in an altercation with Warner, but would not elaborate. Officer Nelson identified State's Exhibit 7, a certified copy of appellant's January 19, 2001 prior conviction for assault in the New Philadelphia Municipal Court.
 {¶ 5} Jimmy Warner testified appellant and his mother had been dating for approximately six months at the time of the incident. Jimmy testified appellant lived at the Logan Street residence with Jimmy, his mother, and his sister. Jimmy explained he placed a 911 call on August 12, 2001, after returning from a friend's house to find his mother and appellant fighting. Jimmy recalls his mother's eye was swollen to the size of a golf ball. Jimmy explained he made the 911 call because he was afraid for his mother, and he was scared something more serious would happen.
 {¶ 6} Helen Warner unwillingly testified. She rationalized appellant's behavior by stating she provoked him. Warner acknowledged she and appellant were dating again.
 {¶ 7} Vicki Redman testified while on her way home from work at approximately 6:25 a.m. on July 26, 2001, she heard someone yelling. She looked back and saw appellant. Redman turned her vehicle around and drove back toward appellant. Appellant entered the vehicle and proceeded to yell at Redman for leaving him by the river the night before when she knew he did not have any place to go. At appellant's instruction, Redman drove the vehicle to the back of a BP gas station. Appellant continued to yell at Redman and eventually struck her in the eye. Appellant demanded money from Redman, and ripped her purse when she told him she did not have any money on her. Redman told appellant she would drive to the Shell Station where she could write a check and get money for him. At the station, Redman told the clerk she was afraid to get back in the car with appellant. Redman walked outside and yelled at appellant to get out of her car. Appellant complied, but he mouthed threats at Redman. Redman subsequently proceeded to the New Philadelphia Police Department where she reported the incident. She also testified she and appellant had lived together in the past as boyfriend and girlfriend.
 {¶ 8} Tamara Arthurs, who was working as a clerk at the Shell Station during the early morning hours of July 26, 2001, testified Redman came into the store and approached the cash register. According to Arthurs, Redman looked distraught. Redman advised Arthurs appellant was in her vehicle and Redman wanted him to leave. Arthurs offered to telephone the police, but Redman stated she just wanted appellant out of her car. Redman walked outside to the corner, said something to appellant, and reentered the store. Thereafter, Arthurs watched appellant exit Redman's vehicle and walk away. Arthurs noted she could tell Redman had been in a scuffle because her face was red and her hair was in a disarray. Arthurs also noticed swelling underneath Redman's right eye.
 {¶ 9} Appellant testified on his own behalf. Appellant testified, after Redman dropped him off by the river on the evening of July 25, 2001, he drank numerous longneck bottles of beer then returned to Warner's home. Appellant denied being with Redman the morning of July 26, 2001. Appellant, who acknowledged he is an alcoholic, stated he did not see Redman until August 10, 2001. He sought her out, knowing she would buy him alcohol. Appellant admits he went to Warner's residence on August 12, 2001. Appellant explained he needed to get some clothes, but knew Warner would be angry with him because he had been with Redman and had been drinking. Appellant proceeded to detail Warner's verbal then physical attacks upon him. On cross-examination, appellant accused the other witnesses of lying. Appellant conceded to the prior assault conviction of January 19, 2001, which involved Redman. The State attempted to impeach appellant by introducing evidence of another assault conviction which involved a peace officer. The trial court gave the jury a cautionary instruction regarding that conviction.
 {¶ 10} After hearing all the evidence and deliberations, the jury found appellant guilty of both counts charged in the indictment. The jury made a special finding appellant was previously convicted of assault. Via Judgment Entry and Order for Sentencing filed May 17, 2002, the trial court memorialized appellant's convictions and ordered a presentence investigation. The trial court scheduled sentencing for July 1, 2002. The trial court sentenced appellant to ten months in imprisonment on each of the counts, and ordered the sentences to be served consecutively. The trial court memorialized the sentences via Judgment Entry on Sentencing filed July 3, 2002.
 {¶ 11} It is from these convictions and sentences appellant appeals, raising the following assignments of error:
 {¶ 12} "I. THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION IN LIMINE TO PREVENT THE STATE FROM USING A PRIOR CONVICTION OF THE DEFENDANT FOR IMPEACHMENT PURPOSES.
 {¶ 13} "II. THE DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS.
 {¶ 14} "III. THE APPELLANT/DEFENDANT'S CONVICTION FOR DOMESTIC VIOLENCE MUST BE REVERSED AS THE INDICTMENT CHARGING THE APPELLANT/DEFENDANT WITH FELONY DOMESTIC VIOLENCE WAS BASED UPON AN UNCOUNSELLED MISDEMEANOR CONVICTION.
 {¶ 15} "IV. APPELLANT/DEFENDANT, JAMES COLLINS' CONVICTIONS FOR FELONY DOMESTIC VIOLENCE SHOULD BE REVERSED DUE TO INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.
 {¶ 16} "V. THE CONVICTION OF THE APPELLANT/DEFENDANT ON THE TWO FELONY COUNTS OF DOMESTIC VIOLENCE WAS AGAINST THE MANIFEST WEIGHT OF AND SUFFICIENCY OF THE EVIDENCE."
 I {¶ 17} In his first assignment of error, appellant maintains the trial court erred in overruling his motion in limine. We disagree.
 {¶ 18} Prior to the commencement of trial, appellant made an oral motion in limine, seeking to prevent the State from using appellant's prior conviction for assault of a peace officer for impeachment purposes. The trial court overruled appellant's motion and ruled it would permit the State to question appellant with respect to this prior conviction. Appellant submits, although the State argued the prior conviction was admissible for purposes of impeaching appellant's credibility, "the State wanted this prior conviction to be admitted into evidence to prove the character of [appellant] and to show that he acted in conformity of the domestic violence charges for which he was standing trial on." Brief of Appellant at 13. Appellant concludes, "pursuant to Rule 404(B), this is clearly not allowed. Evidence of other crimes is not admissible to prove the character of a person in order to show that he acted in comformity therewith." Appellant has misconstrued the State's use of the prior conviction of assault.
 {¶ 19} Evid.R. 609(A) states, in relevant part, "For the purpose of attacking the credibility of a witness: * * * (2) Notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice or confusion of the issues, or of misleading the jury."
 {¶ 20} Under Evid.R. 609, a trial court has broad discretion to determine the extent of the admissibility of prior convictions for impeachment purposes. State v. Wright (1990), 48 Ohio St.3d 5. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. State v. Adams (1980), 62 Ohio St.2d 151.
 {¶ 21} At trial, appellant testified on his own behalf. During his testimony, appellant claimed the State's witnesses lied. The State cross-examined appellant on his prior conviction of assault of a peace officer in order to test his credibility. We find this was an appropriate use of the evidence and the trial court did not abuse its discretion in allowing the State to do so. Furthermore, the trial court instructed the jury as to its limited use of such evidence.
 {¶ 22} Appellant's first assignment of error is overruled.
 II {¶ 23} In his second assignment of error, appellant asserts he was denied his constitutional and statutory right to counsel.
 {¶ 24} On the day of the scheduled sentencing hearing, appellant appeared before the court with trial counsel, Ron Collins. Appellant advised the trial court he no longer wanted Attorney Collins to represent him. The dialogue follows:
 {¶ 25} "THE COURT: So, are you asking to proceed today without Mr. [Ronald] Collins as your attorney? The first thing I need to get over before we can address anything else is whether or not you're sitting here today with or without a lawyer. Are you still-have you changed your mind at all? Mr. Collins, Mr. Ronald Collins says that you have discharged him as your lawyer?
 {¶ 26} "JAMES COLLINS: No.
 {¶ 27} "THE COURT: Is that the same-is that where you are today?
 {¶ 28} "JAMES COLLINS: Yes. But now I got to represent myself, right?
 {¶ 29} "THE COURT: Well, I don't know.
 {¶ 30} "JAMES COLLINS: I know something about the law and I know one thing about right and wrong, and I didn't do this. I done a lot of stupid things, like I told you, but this wasn't one of them. I told you that day that I did hit Jeanne [sic] Warner but I was struck four times before I hit her and where's my son?
 {¶ 31} "THE COURT: He's in the hallway. We don't allow children in here when we're sentencing on parents.
 {¶ 32} "Mr. — if you're asking for Ronald Collins to leave, then what I would probably do is offer your presentence investigation report to a public defender to review and come back in here later this morning to conclude our hearing.
 {¶ 33} "JAMES COLLINS: It doesn't matter. Not one thing, I've looked up everything in Ohio Criminal Law book, everything that I've looked up, Mr. Collins has told me no, that's not, it doesn't apply to me. I don't know why but it doesn't, so I'm willing to take whatever you're willing to give. The only thing I'm worried about is that little boy out there.
 {¶ 34} "THE COURT: Any suggestions from counsel? I mean —
 {¶ 35} "MR. MASTIN: Your Honor, he can waive, he certainly can waive counsel or the Court's suggestion is a good suggestion, we can have someone sit in or if he wants Mr. Collins to sit in for purposes of sentencing and have someone different appointed for purposes of appeal, that's fine too. But he has the right to waive that if he chooses to do so, it's up to him. The Court can inquire as to whether he wants to waive that right to have counsel present and it's up to him. We're all finding out at the last second that this is happening to include [sic] Ron, I believe, so I don't think anyone had any advance warning on this but if the Court wants to come back later this morning, that's fine with me too, I'll be here all day, it doesn't make any difference to me.
 {¶ 36} "THE COURT: Did you want to talk at all with Mr. Collins off the record? Was there any other-any issue you haven't been able to address to this point?
 {¶ 37} "MR. COLLINS: No, your Honor, I think I've put on the record my entire understanding of the way it stands and I knew I had to come here today and find out exactly how it would go, whether he would have another lawyer or be representing himself. It sounds to me as if he's somewhat uncertain as to how he wants to proceed.
 {¶ 38} "THE COURT: Okay.
 {¶ 39} "JAMES COLLINS: Ma'am, I'm not a lawyer. * * *
 {¶ 40} "THE COURT: Okay. Well, what we need to do is address the sentencing today. So, I'm going to allow Mr. Collins to withdraw as your counsel at your request and I'm not, I don't want to proceed through the sentencing hearing without you having the availability of an attorney with you so we will contact the public defender's office, get an attorney over here to review your presentence investigation report and move this hearing to later in the morning to your attorney, to give the public defender a chance to review the matter and give you a chance to talk to him.
 {¶ 41} "So, I would just ask that you stick around, stay here, don't leave. Let's find someone that you can talk to and —
 {¶ 42} "MR. MASTIN: Pat Williams was here just a second ago, your Honor, he may still be.
 {¶ 43} "THE COURT: We'll just set it in here later this morning.
 {¶ 44} "MR. COLLINS: Thank you, your Honor.
 {¶ 45} "THE COURT: Okay, thank you.
 {¶ 46} "JAMES COLLINS: Thank you, Judge."
 {¶ 47} Transcript of July 1, 2002 Sentencing Hearing at 3-6.
 {¶ 48} Later that same day, the trial court resumed the proceedings:
 {¶ 49} "THE COURT: Okay. We're back on the record in Case 2001 CR 08 0217, State versus James Collins. State is represented in Court by Assistant Prosecuting Attorney Scott Mastin and we have Assistant Public Defender Patrick Williams here with Mr. Collins. I want to thank Mr. Williams for taking the time to talk with Mr. Collins today and reviewing the presentence investigation report.
 {¶ 50} "Are there any preliminary matters?
 {¶ 51} MR. WILLIAMS: Your Honor, I don't know that they would be appropriately dealt with at this juncture, but I will be saying at, during my recitation to the Court regarding this case. It may be appropriate for Mr. Collins to file a petition for post-conviction release based upon newly discovered evidence that he has presented to me which would tend to indicate that there was some perjured testimony that may have gone on by one of the victims, being Vicki Redman, and I will address the Court regarding that incident or the substance of that testimony in the sentencing hearing.
 {¶ 52} "THE COURT: Okay.
 {¶ 53} "MR. WILLIAMS: But I just wanted to call that to the Court's attention. I would note that I, it is a little bit awkward for me to step in and [sic] basically the eleventh and-a-half hour, but Mr. Collins has indicated a willingness to allow me to proceed and represent him at this juncture.
 {¶ 54} "THE COURT: Okay, thank you." Sentencing Tr. 6-7.
 {¶ 55} Appellant asserts he was denied his constitutional and statutory right to counsel because of a conflict of interest with the public defender's office[1]; and because counsel had an inadequate amount of time in which to prepare for the sentencing hearing. We find the record belies appellant's assertions. First, the trial court and the State specifically mentioned contacting the public defender's office. Appellant did not object. In fact, when appellant and Attorney Williams returned for sentencing, Attorney Williams noted appellant's willingness to allow the attorney to represent him. Additionally, there is no affirmative record demonstrating the amount of time Attorney Williams was given for preparation was inadequate.
 {¶ 56} Appellant's second assignment of error is overruled.
 III {¶ 57} In his third assignment of error, appellant argues his convictions must be reversed as the offenses charged in the indictment were charged as felonies based upon an uncounseled misdemeanor conviction.
 {¶ 58} A review of the record belies appellant's assertion the prior misdemeanor conviction, which was used to enhance the instant offenses to felonies, was uncounseled. At trial, the State introduced, and the trial court admitted, State's Exhibit 7, which was a certified copy of appellant's January 19, 2001 assault conviction. The exhibit was identified by Officer Nelson, Vicki Redman, and appellant. A review of the judgment entry establishes appellant was, in fact, represented by counsel at that time.
 {¶ 59} Appellant's third assignment of error is overruled.
 IV {¶ 60} In his fourth assignment of error, appellant raises an ineffective assistance of counsel claim.
 {¶ 61} The standard of review of an ineffective assistance of counsel claim is well-established. Pursuant to Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 673, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial court would have been different. State v. Bradley (1989),42 Ohio St.3d 136, 538 N.E.2d 373; State v. Combs, supra.
 {¶ 62} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley, 42 Ohio St.3d at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
 {¶ 63} In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Bradley, supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
 {¶ 64} Appellant takes issue with trial counsel's failure to proffer letters, photographs and documents from Redman into the record. The introduction of this evidence was discussed prior to trial based upon the State's motion in limine. Appellant's trial counsel argued he intended to introduce the evidence to establish Redman's motives for accusing appellant of assaulting her.
 {¶ 65} The trial court ruled the evidence was not relevant and excluded the same. During his cross-examination of Redman, Attorney Collins questioned Redman in detail regarding the character of her relationship with appellant, her desire to continue the relationship, and any motive she may have had for making the allegations against appellant. Attorney Collins did not proffer the documentary evidence. We find trial counsel's failure to proffer the letters, photographs, and documents was not ineffective as trial counsel was able to elicit the same testimony via cross-examination.
 {¶ 66} Appellant further submits trial counsel was ineffective for failing to raise the issue of Redman's history of self-inflicted injury and suicide attempts. We find no record demonstration which supports these claims. Assuming, arguendo, trial counsel was ineffective for failing to proffer certain evidence and failing to elicit testimony, we find appellant cannot establish he was prejudiced thereby. Because appellant cannot satisfy either prong of Strickland, we overrule appellant's fourth assignment of error.
 V {¶ 67} In his final assignment of error, appellant argues his convictions were against the manifest weight and sufficiency of the evidence. Specifically, appellant maintains the State failed to establish the victim in each count was a family or household member. Appellant contends the felony domestic violence convictions were against the manifest weight and sufficiency of the evidence as the prior misdemeanor assault conviction was erroneously admitted.
 {¶ 68} With respect to the latter argument, for the reason we overruled appellant's third assignment of error, we overrule this portion of appellant's fifth assignment of error.
 {¶ 69} We now turn to appellant's argument the State failed to prove Redman and Warner were household members.
 {¶ 70} R.C. 2919.25(E)(1) defines "family or household member" as follows: "any of the following who is residing or has resided with the offender. * * * A spouse, a person living as a spouse, or a former spouse of the offender." R.C. 2919.25(E)(1)(a).
 {¶ 71} R.C. 2919.25(E)(1)(2) provides: "(2) `Person living as a spouse' means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question."
 {¶ 72} As set forth supra in our Statement of the Case and Facts, Redman testified she lived with appellant during the beginning months of 2001. Additionally, Warner and Jimmy Warner both testified appellant lived with them at the Logan Street residence.
 {¶ 73} Appellant's fifth assignment of error is overruled.
 {¶ 74} Appellant's convictions and sentences entered by the Tuscarawas County Court of Common Pleas are affirmed.
By: Hoffman, P.J., Wise, J., and Boggins, J. concur.
[1] In his brief to this Court, appellant contends he had no knowledge Attorney Patrick Williams was in the Joint Public Defender's Office until after the hearing.